## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ROCCO DUARDO and SCOTT SYBEL,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**CITY OF HACKENSACK; FRANK AQUILA; TIM LLOYD; PETER BUSCIGLIO; DAVID TROAST; and TED EHRENBURG,**<br><br>**Defendants.** | Civ. No. 2:17-CV-2308-WJM-ESK<br><br><br>**OPINION** |

<u>**WILLIAM J. MARTINI, U.S.D.C.**</u>

This matter arises out of a series of longstanding employment-related disputes between current and former officers in the Hackensack Police Department (the "HPD") Rocco Duardo ("Duardo") and Scott Sybel ("Sybel" and, together with Duardo, "Plaintiffs") and fellow HPD officers Frank Aquila ("Aquila"), Timothy Lloyd ("Lloyd"), and Peter Busciglio ("Busciglio"), former Hackensack city managers David Troast ("Troast") and Theodore Ehrenburg ("Ehrenburg," and, together with, Aquila, Lloyd, Busciglio, and Troast, the "Individual Defendants"), and the City of Hackensack (the "City" and, together with the Individual Defendants, "Defendants"). Before the Court are Defendants' motions (the "Motions") for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendants' Motions are **GRANTED**.[1]

---

[1] Throughout this Opinion, the Court cites to a variety of materials in the record and statements of facts from the parties. The various certifications and submissions by the parties will be abbreviated as follows:

> "**Def. SOMF – Duardo**": Defendants' Statements of Material, Undisputed Facts Pursuant to D.N.J. Civ. R. 56.1 In Support of Motion for (Partial) Summary Judgment as to Plaintiff Rocco Duardo (ECF No. 121-1)

> "**Duardo CSOMF**":  Plaintiff Rocco Duardo's Counterstatement of Material Facts in Opposition to Defendants' Motion for Summary Judgment (ECF No. 132)

> "**Def. Reply SOMF**": Defendants' Reply to Plaintiff Rocco Duardo's Responses to Defendants' Statements of Facts Pursuant to D.N.J. Civ. R. 56.1, Including Supplemental Statements of Fact (ECF No. 144-1)

# I.    BACKGROUND

## A.    The Parties

The HPD is separated into a number of different divisions, including the narcotics, youth, traffic, internal affairs, patrol, and BCI divisions. (Hastings Cert. – Duardo, Ex. 6 at 12:15-13:2). The Department is run by a police captain serving as an "Officer in Charge" (the "<u>OIC</u>") who answers directly to, and is appointed by, the city manager. For some time, the HPD also included a "Police Director" position who was also empowered to appoint officers in charge. (*See* Groh Cert. – Duardo, Ex. D).

Several of the Individual Defendants held important roles in the City and HPD hierarchy. From approximately March 2015 through approximately February 2016, Defendant Lloyd served as OIC, after which he served as commander of the BCI division. (Hastings Cert. – Duardo, Ex. 11 at 5:14-21). Defendant Aquila served as OIC from approximately April 29, 2016 until approximately September 2018. (Hastings Cert. – Duardo, Ex. 6 at 6:1-12). Defendant Troast served as city manager of Hackensack from September 2, 2014 until his retirement on October 1, 2016. (Groh Reply Cert. – Duardo, Ex. O). Defendant Ehrenburg succeeded Troast as city manager effective October 1, 2016. (*Id.*). Busciglio, also a captain in the HPD, served as administrative aide in 2016, until he was temporarily reassigned by then-OIC Aquila to the internal affairs division effective January 1, 2017. (Groh Cert. – Duardo, Ex. E). Finally, though not a party to this action,

---

"**<u>Def. Resp. to Duardo CSOMF</u>**": Defendants' Responses to Plaintiff Rocco Duardo's Counterstatements of Facts Pursuant to D.N.J. Civ. R. 56.1 (ECF No. 144-2)

"**<u>Groh Cert. – Duardo</u>**": Certification of Counsel in Support of Motion for Summary Judgment as to Plaintiff Rocco Duardo (ECF Nos. 120, 121-2)

"**<u>Hastings Cert. – Duardo</u>**": Certification of Counsel in Opposition to Summary Judgment as to Plaintiff Rocco Duardo (ECF No. 135)

"**<u>Groh Reply Cert. – Duardo</u>**": Reply Certification of Counsel in Support of Motion for Summary Judgment as to Plaintiff Rocco Duardo (ECF No. 144-3).

"**<u>Def. SOMF – Sybel</u>**": Defendants' Statements of Material, Undisputed Facts Pursuant to D.N.J. Civ. R. 56.1 in Support of Motion for (Partial) Summary Judgment as to Plaintiff Scott Sybel (ECF No. 119-3)

"**<u>Groh Cert. – Sybel</u>**": Certification of Counsel in Support of Motion for Summary Judgment as to Plaintiff Scott Sybel (ECF No. 119-4)

"**<u>Hastings Cert. – Sybel</u>**": Certification Counsel in Opposition to Summary Judgment as to Plaintiff Scott Sybel (ECF No. 138)

Michael Mordaga served as Police Director from January 23, 2013 until his resignation on May 16, 2016. (Groh Reply Cert. – Duardo, Ex. O).[2]

Assignments within the HPD are temporary, and officers may be reassigned to different divisions by the OIC, or, while the position existed, the Police Director. (Hastings Cert. – Sybel, Ex. B. at 42:9-11, 44:10-25; *see* Groh Cert. – Sybel, Ex. J). Both Plaintiffs have served in multiple divisions during their tenures with the HPD. From the time he began his career with the Department in 2004 until some point in 2013, Duardo was assigned to the patrol division. (Def. SOMF – Duardo ¶ 1; Hastings Cert. – Duardo, Ex. 84:1-6). From late 2013 through 2016, Duardo worked as a detective in the narcotics division. (Def. SOMF – Duardo ¶ 6). Most recently, on December 22, 2016, Duardo was reassigned back to the patrol division effective January 1, 2017 by then-OIC Aquila. (*Id.* at ¶ 14).

Sybel, who began his career with the HPD in January 1992, served as a lieutenant from August 1, 2015 until his retirement on March 1, 2017. (Def. SOMF – Sybel ¶¶ 1, 10). From at least 2015 through May 2, 2016, Sybel was the internal affairs supervisor. (Groh Cert. – Sybel, Ex. J). On May 2, 2016, then-Director Mordaga temporarily reassigned Sybel as commanding officer of the narcotics division. (*Id.*; Def. SOMF – Sybel ¶¶ 11, 13). Though Sybel remained a lieutenant in the narcotics division until his retirement, he was replaced as commanding officer of the division on August 1, 2016 by Captain Vincent Riotto ("Riotto"). (Groh Cert. – Sybel, Ex. P).

**B.    The 2009 Lawsuits**

In 2009, both Duardo and Sybel, as well as other members of the HPD, sued the City and several other individuals alleging that former chief of police of the HPD, Charles K. Zisa ("Zisa"), and others engaged in a pattern of extortion and retaliation against HPD officers who refused to donate to his brother's political campaigns and those of his allies (the "*Borntrager* Lawsuit"). (Def. SOMF – Duardo ¶ 3; *see also* Duardo CSOMF ¶¶ 1-2, 8). That same year, Sybel, Riotto, and others filed a second lawsuit against the City, Zisa, and others (the "*Aiellos* Lawsuit" and, together with the *Borntrager* Lawsuit, the "2009 Lawsuits") alleging related claims of retaliation. (Duardo CSOMF ¶ 2). Though Lloyd was apparently initially named as a defendant in the *Aiellos* Lawsuit, he was later dismissed from the case and Sybel did not recall having any direct claims against him. (Def. SOMF – Sybel ¶¶ 4-5). None of the other Individual Defendants were named as defendants in either of the 2009 Lawsuits. (Def. SOMF – Duardo ¶ 4; Def. SOMF – Sybel ¶¶ 6-7). The 2009 Lawsuits were eventually settled at some point in 2013. (Duardo CSOMF ¶ 10).

**C.    Alleged Retaliation for the 2009 Lawsuits**

Beginning in late 2015 and continuing throughout 2016, Plaintiffs allege they suffered retaliation at the hands of the Individual Defendants for their participation in the

---

[2] The record does not indicate if anyone has held the position of Police Director following Mordaga's resignation.

2009 Lawsuits. The Court will summarize the alleged retaliatory actions with respect to each Plaintiff.

### 1. Duardo

Duardo alleges that, following the resignation of Director Mordaga and the appointment of Aquila as OIC in April 2016, he began to experience retaliation for his participation in the 2009 Lawsuits. First, between June and August of 2016, the HPD engaged USA Security Services, Inc. to provide security upgrades to the Department's headquarters, including the installation of motion detectors, emergency panic buttons, access and access control equipment to certain areas in headquarters, and six security cameras in various places around headquarters, including in the hallway leading to both the narcotics and internal affairs offices. (Groh Cert. – Duardo, Ex. G; Hastings Cert. – Duardo, Ex. 6 at 19:5-20:7). Both Duardo and Sybel testified that they believed that Aquila ordered the installation of security cameras in the hallway outside of the narcotics division's office within the HPD headquarters in order to closely monitor their activities or to otherwise intimidate them. (Hastings Cert. – Duardo, Ex. 3 at 41:24-42:7; Hastings Cert. – Duardo, Ex. 5 at 135:5-14). Duardo further testified that he heard from multiple officers, including his brother, that cameras were being installed because Aquila was "gunning for" them. (Hastings Cert. – Duardo, Ex. 3 at 41:3-23).

Second, Duardo was the target of two separate internal affairs investigations. The first investigation concerned Duardo's decision to start wearing his hair in a bun shortly after Aquila became OIC in apparent violation of the Department's rules and regulations. Beginning in June 2016, Duardo was instructed by Aquila and at least one other captain in the HPD, Patrick Coffey, to change his hairstyle. (Def. Reply SOMF ¶ 9). Duardo testified that he felt he was being unfairly targeted for his hairstyle because uniformed female officers had worn similarly impermissible hairstyles without issue. (Hastings Cert. – Duardo, Ex. 3 at 69:22-71:7). Duardo further testified that, after he failed to obey orders to change his hairstyle, he was reluctantly written up by Lieutenant Mike Antista who claimed that he had been ordered to discipline Duardo because "Captain Aquila [was] gunning for him" and "want[ed] him out." (*Id.* at 66:4-67:18). On October 13, 2016, Duardo was issued a Preliminary Notice of Disciplinary Action ("PNDA") authorized by Ehrenburg suspending him for ten (10) days without pay for violation of the rules and regulations regarding personal appearance and insubordination. (Groh Cert. – Duardo, Ex. H). The PNDA specified that Duardo both ignored orders to change his hairstyle and provided false statements to internal affairs regarding whether he wore his hair in a bun while on-duty after he was written up by Antista. (*Id.*). Duardo, on the advice of counsel, eventually accepted a reduced five (5) day suspension without pay on January 23, 2017. (Groh Cert. – Duardo, Ex. K). He testified, however, that he only agreed to accept a five-day suspension after his attorney told him that he was a "dead man" because the City's attorney, Ray Wiss, said that the administration "hated" him due to the 2009 Lawsuits and "wanted [him] out of the way." (Hastings Cert. – Duardo, Ex. 3 at 61:1-65:18). During his own deposition, Aquilla testified that if Duardo had changed his hairstyle when told to do so, there would not have been any need for discipline. (Hastings Cert. – Duardo, Ex. 6 at 111:19-22).

The second investigation concerned an encounter between Duardo and Lloyd that took place on October 26, 2016. That afternoon, Duardo walked down the hallway in the HPD headquarters towards the narcotics office and jokingly stated "what's up rats?" to his colleagues. (Def. Reply SOMF ¶ 11). Lloyd, who was assigned to the BCI division at that time, was standing on the other end of the hallway and believed that Duardo had called him a "rat." (Hastings Cert. – Duardo, Ex. 11 at 15:3-9). Lloyd testified that he then confronted Duardo in the narcotics office, Duardo clarified that he was not referring to Lloyd, and that Riotto later got involved and instructed Lloyd not to speak with officers in the narcotics division without his permission. (*Id.* at 18:8-19:17). Notwithstanding Duardo's denial, and after consulting with Aquila, Lloyd filed an internal affairs complaint regarding the incident. (*Id.* at 20:6-18; Hastings Cert. – Duardo, Ex. 6 at 80:14-24; Groh Cert. – Duardo, Ex. I). Following an investigation, the charges against Duardo for calling Lloyd a "rat" were not sustained; however, internal affairs did conclude that the use of the term "rat" in front of other employees was itself a violation of the Department's rules and regulations. (Groh Cert. – Duardo, Ex. J).

Third, on December 22, 2016, Duardo was reassigned by Aquila from the narcotics division to the patrol division, effective January 1, 2017. (Def. SOMF – Duardo ¶ 14). Aquila testified that he chose to reassign Duardo from narcotics to patrol because he believed that Duardo needed more structure and because he had been untruthful in multiple internal affairs investigations, including the recent investigation of his hairstyle. (Hastings Cert. – Duardo, Ex. 6 at 15:9-16, 108:11-16).

Fourth, Duardo alleges he was retaliated against and embarrassed by Aquila due to a conversation Aquila had with Riotto in his office in front of his secretary during which he disclosed Duardo's internal affairs matters, in apparent violation of Department guidelines. Aquila testified that Riotto asked him why Duardo was being reassigned from narcotics to patrol when the narcotics division was already understaffed. (Hastings Cert. – Duardo, Ex. 6 at 17:5-12, 95:5-7). In response to Riotto's inquiries, Aquila said that Duardo needed more structure, and was at risk of throwing his career away because he had been untruthful in internal affairs investigations on multiple occasions. (*Id.* at 108:11-16). In a February 15, 2017 memo to Aquila, Duardo noted that he believed this conversation regarding his internal affairs history was improper, and Aquila referred the matter to internal affairs to investigate. (Def. SOMF – Duardo ¶¶ 30-31; Groh Cert., Ex. L). When approached by internal affairs, Duardo declined to file a formal complaint. (Def. SOMF – Duardo ¶ 31; Groh Cert., Ex. M).

Fifth, after being notified of his reassignment to the patrol division, Duardo requested, and was denied, a switch from the day shift to the night shift. Duardo testified that, upon being reassigned, he filed paperwork requesting the night shift due to caretaking responsibilities with his son and to avoid his superiors in the Department who did not work nights. (Hastings Cert. – Duardo, Ex. 3 at 86:10-19). He claimed that, as one of the more senior officers in the patrol division, he should have been entitled to his choice of shift, and that Aquila assured him he would be given the night shift. (*Id.* at 82:19-83:13). Duardo further testified, however, that he was ultimately assigned to the day shift, that more junior

officers were awarded the night shift, and that his attempts to swap shifts with those junior officers were denied. (*Id.* at 83:6-13, 85:14-86:9). Aquila testified differently. While Aquila acknowledged that, during the HPD's experimentation with so-called "steady shifts," which prevented officers from switching shifts during a given term, more senior officers had priority in selecting shifts, he testified that he only informed Duardo that his request "shouldn't be a problem" but that the decision was ultimately in the hands of Captain Brian Corcoran ("Corcoran"), commander of the patrol division. (Hastings Cert. – Duardo, Ex. 6 at 97:10-98:5). Aquila testified that Corcoran did not need to seek approval from him to designate shift assignments and denied ever ordering Corcoran to refuse Duardo's request for the night shift. (*Id.* at 96:15-97:9).

                **2.**      **Sybel**

Like Duardo, Sybel alleges he began to suffer retaliation for his participation in the 2009 Lawsuits in late 2015 and throughout 2016. First, Sybel alleges that he was the target of a series of complaints and subsequent internal affairs investigations, none of which were ultimately sustained:

- On January 6, 2016, an anonymous complaint alleged that Sybel and Riotto stole time from the City when they met with their own lawyer for over two hours while on duty. Following an investigation, internal affairs exonerated both officers, and found that Sybel and Riotto only met with the lawyer for less than 10 minutes to drop off documents in connection with a separate pending internal affairs investigation. (Hastings Cert. – Sybel, Ex. F).

- On June 14, 2016, another anonymous complaint again alleged that Sybel was stealing from time the City, this time by spending prolonged periods of his shift at a diner. Following an investigation, internal affairs concluded that these charges were not sustained. (Hastings Cert. – Sybel, Ex. G).

- On August 23, 2016, Sybel was a target of an investigation into money that was missing from an envelope with his name on it in an evidence vault from a case approximately twenty years earlier. (Hastings Cert. – Sybel, Ex. N at 112:5 – 114:9). Lloyd, who was then the commanding officer of the BCI division, testified that he initiated this investigation after the officers under his command in charge of evidence reported that money was missing. (Hastings Cert. – Sybel, Ex. M at 47:7-24). Though he forwarded the matter to internal affairs, Lloyd stated that he did not participate in the investigation or identify any potentially guilty party. (*Id.*). The charges against Sybel were ultimately not sustained. (Hastings Cert. – Sybel, Ex. N at 112:5 – 114:9)

Though not alleged in the Amended Complaint, Sybel also argues that he was the subject of two other frivolous anonymous complaints:

- On December 8, 2015, an anonymous complaint alleged that Sybel was impermissibly working on a construction project inside the traffic bureau. Following a brief investigation, the charges were not sustained and internal

affairs concluded that, although Sybel made a comment about a wall not being load-bearing, he was not "working in any capacity" on the project. (Hastings Cert. – Sybel, Ex. D).

- On December 21, 2015, an anonymous complaint alleged that Sybel, who was then the internal affairs supervisor, tipped off another officer that he was the target of an internal affairs investigation and that Sybel should be removed from the internal affairs division because he was the target of other investigations. Once again, after an investigation, the charges were not sustained. (Hastings Cert. – Sybel, Ex. E).

Aside from these internal affairs investigations, Sybel also claims that he was retaliated against when Troast and Aquila denied, or otherwise ignored, his requests for additional manpower to the narcotics division while he was commanding officer thereof. (*See* Groh Cert. – Sybel, Ex. L). Specifically, Sybel testified that, despite his requests, Aquila would reassign officers to other divisions but never to narcotics and that Troast did nothing to rectify the manpower shortage which endangered officer safety. (Hastings Cert. – Sybel, Ex. B at 44:23 – 45:23, 46:10 – 47:19). In response to Sybel's requests, Aquilla wrote a memo in which he explained that he had previously reassigned officers to the narcotics division, had removed an officer therefrom at Sybel's own request, and was hopeful that personnel shortages would be addressed in the coming months. (Groh Cert. – Sybel, Ex. M). Aquila testified that he recalled Riotto, after he became commanding officer of narcotics, making a similar request, to which he responded that "all divisions needed more manpower" which the HPD just did not have. (Hastings Cert. – Sybel, Ex. N at 17:5-12).

Finally, Sybel alleges he was retaliated against when he was "demoted" from commanding officer of the narcotics division upon Riotto's reassignment. On July 27, 2016, Sybel informed Aquila that he planned to retire in 2017. (Def. SOMF – Sybel ¶ 19). The following day, July 28, 2016, Aquila temporarily reassigned Riotto as commanding officer of the narcotics division, effective August 1, 2016. (Groh Cert. – Sybel, Ex. P). At his deposition, Sybel admitted that he did not lose any compensation or benefits as a result of Riotto's reassignment to commanding officer of the narcotics division. (Def. SOMF – Sybel ¶ 45). Rather, Sybel claims he suffered because he lost most of his responsibility and "went from commander [to] answering to a captain that had no knowledge of narcotics." (*Id.* at ¶ 46).

Though none of the anonymous complaints or personnel changes appear to have affected Sybel's employment or compensation, he claims that the cumulative effects of these issues led him to not only put in for his retirement, but to move up his retirement date

from August 1, 2017 to March 1, 2017, costing him future salaries, potential promotions, and a larger pension.[3]

### D.      The Current Lawsuit

The current lawsuit (the "Current Lawsuit") was commenced on April 5, 2017. The original Complaint included claims from four officers, Duardo, Sybel, Riotto, and Allan DeLeon alleging, among other things, retaliation for their participation in the 2009 Lawsuits by the City and the Individual Defendants other than Busciglio, who was not initially named as defendant. The City was served with the Summons and Complaint on April 17, 2017. (Groh Reply Cert. – Duardo, Ex. P).

Plaintiffs claim that, prior to the filing of the Complaint, rumors about the Current Lawsuit began circulating throughout the HPD and that, as early as 2016, some members of the HPD asked to be "left out of the lawsuit." (*See, e.g.*, Hastings Cert. – Duardo, Ex. 3 at 67:10-24). In particular, Plaintiffs claim that on April 1, 2017, Busciglio threatened and intimidated patrol officer Victor Vazquez ("Vazquez"), who is not a party to this action, in an attempt to avoid being named in the Current Lawsuit. Vazquez testified that he was instructed to report 101 Hobart Street in Hackensack, where he met with Busciglio, who was off-duty at the time, and an unknown third party in front of a table full of firearms, including a shotgun. (Hastings Cert. – Duardo, Ex. 24 at 5:5-8:12). Vazquez further testified that during this meeting, Busciglio told him that he was the target of an ongoing internal affairs investigation, that he could could help Vazquez get his preferred assignment in the narcotics division if he told Riotto and the other officers to dismiss their lawsuit, and then mentioned how his father was killed by the same type of shotgun that was placed on the table in front of them. (*Id.* at 9:15-12:18). At his own deposition, Busciglio acknowledged meeting with Vazquez at 101 Hobart Street, but testified that it "had nothing to do with the investigation" and that he only asked Vazquez to meet with him to speak to his friend about a gun purchase after receiving permission from his supervisor. (Hastings Cert. – Duardo, Ex. 17at 118:9-119:5). He expressly denied ever discussing any lawsuit, and testified that, at the time, he did not know about any potential or pending lawsuit. (*Id.* at 120:10-11, 121:1-5).

### E.      Retaliation for the Current Lawsuit

In the Amended Complaint, Plaintiffs allege that they have continued to suffer retaliation from each of the Defendants due to the filing of the Current Lawsuit. This alleged retaliation, however, is closely connected to two related investigations of several officers, including Plaintiffs, for their roles in the warrantless search of an apartment in December 2016, which have themselves spawned protracted litigation. The Court summarizes these investigations and the subsequent litigation as a result thereof before identifying Plaintiffs' respective claims of retaliation.

---

[3] The Amended Complaint alleges only that Sybel resigned effective March 1, 2017 due to "intolerable" working conditions; it does not allege that Sybel had been planning to retire on August 1, 2017 but moved that date up as a result of any retaliation. (*See* Am. Compl. ¶ 207).

### 1.   64 Prospect Investigation

On December 28, 2016, Duardo, Sybel, other five other officers, including Riotto and Vazquez, took part in an investigation of 64 Prospect Avenue, Apartment C7 in Hackensack in connection with suspected firearms and/or narcotics activity. (Def. SOMF – Duardo ¶ 15). Several of the officers, including Duardo and Sybel, allegedly entered and searched the apartment without a warrant. (*Id.*). After returning from the investigation, one of the other officers wrote a report which was filed in the HPD database describing the investigation as both a "narcotics investigation" and a "welfare check" and indicating that they entered the apartment after an anonymous resident informed them that a child was left inside unattended. (Hastings Cert. – Duardo, Ex. 14).

On March 28, 2017, the internal affairs division received an anonymous letter (the "64 Prospect Letter") that stated, among other things, that "Captain Riotto and his boys covered up 64 Prospect Ave, the reports are full lies!!" (Hastings Cert. – Duardo, Ex. 18 at 6). Approximately one week later, Busciglio, who was assigned to the internal affairs division at the time and who initially read the 64 Prospect Letter, opened an administrative investigation (the "64 Prospect Investigation"). (Hastings Cert. – Duardo, Ex. 17 at 7:12-15). After connecting the letter to the narcotics division's December 28, 2016 investigation of Apartment C7 at 64 Prospect Avenue, Busciglio and other members of the internal affairs division interviewed a number of the building's residents, including the tenant who lived in Apartment C7, and reviewed security camera footage. (Hasting Cert., Ex. 19 at 163:1-164:5; Hastings Cert. – Duardo, Ex. 18).[4] In his completed June 1, 2017 report, Busciglio concluded that there were inconsistencies and inaccuracies in the officers' report and that the officers, including Duardo and Sybel, "illegally entered the building to conduct, or conspired to conduct, an illegal entry and search of apartment C7 without a search warrant or other legal justification." (Hastings Cert. – Duardo, Ex. 18 at 14).

On May 9, 2017, Ehrenburg issued Duardo a notice of immediate suspension suspending him without pay as well as a PNDA seeking his termination for the warrantless search of Apartment C7 at 64 Prospect Avenue. (Hastings Cert. – Duardo, Ex. 29). Administrative charges were also brought against each of the other officers involved in the warrantless search of Apartment C7 at 64 Prospect Avenue suspending them without pay and seeking their termination, except for Sybel, who had already retired from the HPD. (Hastings Cert. – Duardo, Ex. 33 at 1). Riotto retired with a full pension and charges were

---

[4] Though it appears it must have been authored by a member of the HPD, Busciglio did not attempt to determine who authored the 64 Prospect Letter. (Def. Resp. to Duardo CSOMF ¶ 45). On October 12, 2017, Sybel filed an Open Public Records Act ("OPRA") request for security camera footage from inside HPD overlooking a hallway near the internal affairs mailbox on March 27, 2017 and March 28, 2017, which was denied by the City on October 30, 2017 as outside OPRA's definition of a "government record." (Hastings Cert. – Duardo, Ex. 22). In its December 27, 2017 response to a subsequent OPRA request by an attorney representing one the officers in the pending disciplinary proceedings, the City stated that the records no longer existed and had been taped over. (Hastings Cert. – Duardo, Ex. 23).

not pursued against him. (Hastings Cert. – Duardo, Ex. 33 at 6). After multiple hearings and appeals before several administrative and judicial tribunals, though the charges related to the warrantless entry of Apartment C7 were sustained Duardo and Vazquez's terminations were reversed, and both were instead given a six-month suspension without pay, the terminations of the two officers who were responsible for the false police report were upheld, and another officer who did not enter the apartment at all was cleared of all charges and reinstated. (Hastings Cert. – Duardo, Ex. 37 at 1; Hastings Cert. – Duardo, Ex. 38).[5] As of the date of this Opinion, the City's petition for certiorari is currently pending before the New Jersey Supreme Court. (Duardo CSOMF ¶¶ 137-38).

### 2.     Brady Investigation

On July 20, 2017, the Bergen County Prosecutor's Office (the "BCPO") sent Aquila and Ehrenburg a letter (the "Brady Letter") stating that, as a result of the 64 Prospect Investigation, (1) a number of criminal cases against defendants in which the subject officers were involved would be dismissed; and (2) decisions regarding the future testimony of any of these officers involved in the 64 Prospect Investigation would be made on a case-by-case basis. (*Id.* at ¶¶ 141-42).

After receiving an internal affairs complaint from Aquila regarding the Brady Letter, Busciglio opened a second investigation against Duardo and several other officers (the "Brady Investigation"). (*See* Hastings Cert. – Duardo, Ex. 39). On September 1, 2017, Duardo was issued a second PNDA, this time by Aquila, suspending him with pay and again seeking his removal from the HPD, charging him with violations of various statutes and HPD rules and regulations stemming from the Brady Letter. (Hastings Cert. – Duardo, Ex. 42). On September 27, 2017, Busciglio completed the Brady Investigation and filed a report in which he concluded that it was "undisputed" that Duardo and the other subject officers were placed on the BCPO's "Brady list" and that, as a result, Duardo and the other subject officers were unable or incapable of performing their duties as police officers and endangered ongoing or future criminal prosecutions. (Hastings Cert. – Duardo, Ex. 39).

Duardo and the other officers' terminations in relation to the Brady Investigation were eventually reversed, and Duardo and Vazquez were ordered to be reinstated because they had already served their six-month suspension in connection with the 64 Prospect Investigation. (Hastings Cert. – Duardo, Ex. 46). This matter is also the subject of an appeal filed by the City that is currently pending before the Appellate Division. (Duardo CSOMF ¶ 158).

### 3.     Retaliation Against Duardo for the Current Lawsuit

In the Amended Complaint, Duardo alleges that Defendants retaliated against him by issuing the May 9, 2017 PNDA suspending him without pay and seeking his termination from the HPD. In opposing Defendants' Motions, however, Duardo identifies a litany of

---

[5] During the pendency of the 64 Prospect Investigation, the Bergen County Prosecutor's Officer considered, but ultimately declined, criminal charges against each of the officers involved in the warrantless search of Apartment C7. (Hastings Cert. – Duardo, Ex. 31).

actions arising out of the 64 Prospect and Brady Investigations he claims were, in fact, retaliation for the Current Lawsuit, including claims related to the initiation and prosecution of the 64 Prospect Investigation, public statements and press releases by certain of the Individual Defendants regarding the 64 Prospect Investigation, and the City's litigation strategy with respect thereto. In essence, Duardo argues that the entire series of investigations and punishments was manufactured by Busciglio, who he claims authored the anonymous 64 Prospect Letter, and that the Investigation itself was contrary to applicable Attorney General Guidelines, incomplete, and intentionally ignored exculpatory evidence. Duardo argues that the Brady Investigation, the City's litigation strategy in seeking his termination, and Ehrenburg's public statements with respect thereto, are all evidence of the Defendants' retaliatory animus and desire to terminate him for his participation in the Current and 2009 Lawsuits.

### 4.    Retaliation Against Sybel for the Current Lawsuit

Sybel also alleges that he continued to be retaliated against because of his involvement in this action even though he had retired on March 1, 2017. In particular, he alleges that Busciglio and the City retaliated against him by sending him letters and sending officers to his home in connection with the ongoing 64 Prospect Investigation. On May 1, 2017, he received a letter from Busciglio providing that the internal affairs unit was conducting a criminal investigation into the December 28, 2016 search of Apartment C7 at 64 Prospect Avenue and requesting that he come in for an interview. (Hastings Cert. – Sybel, Ex. J). On May 12 and 17, 2017, Sybel also received letters from the City's attorney, Ray Wiss, stating that the incident was being reviewed by the BCPO and that it was "imperative" that Sybel or his attorney contact him to discuss the matter before the City took any further action, "including communications with the Division of Pensions." (Hastings Cert. – Sybel, Exs. K & L).

In his opposition to Defendants' Motions, Sybel also argues that Busciglio retaliated against him by sending officers to Sybel's house to try and deliver documents on two separate occasions after Sybel's attorney had already demanded that all such communication be directed to his office instead. (Hastings Cert. – Sybel, Ex. A at 89:10 – 92:4).

### F.    Procedural History

On May 19, 2017, Plaintiffs filed the Amended Complaint adding allegations related to the 64 Prospect Investigation and naming Busciglio as an additional defendant. Since the filing of the Amended Complaint, both DeLeon and Riotto stipulated to the dismissal of their claims against all Defendants with prejudice. Currently, the only remaining Plaintiffs in this case are Duardo and Sybel, both of whom oppose Defendants' Motions as to their respective claims.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Not every factual dispute will preclude summary judgment, and those concerning "irrelevant or unnecessary" facts will not factor into the Court's analysis. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Rather, "a fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015) (citing Anderson, 477 U.S. at 248). Similarly, a dispute with respect to a material fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." Id. (quoting Anderson, 477 U.S. at 248).

The moving party bears the initial burden of establishing that no genuine issue of material fact remains for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence. . . that would entitle it to a directed verdict if not controverted at trial." Id. at 331. If, however, the burden of persuasion at trial would be on the nonmoving party, the movant may satisfy its burden by either: (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim"; or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." Id. (citations omitted). Once the moving party meets this burden, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial and do more than simply show that there is some metaphysical doubt as to the material facts." United States v. Donovan, 661 F.3d 174, 185 (3d Cir. 2011) (emphasis in original and internal quotation marks omitted) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). This requires the nonmoving party to present actual evidence that creates a genuine dispute for trial – reliance on unsupported assertions, speculation, or conclusory allegations is insufficient to defeat a properly supported motion for summary judgment. Solomon v. Soc'y of Auto. Eng'rs, 41 F. App'x 585, 586 (3d Cir. 2002) (citing Celotex, 477 U.S. at 324); see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.").

In deciding a motion for summary judgment, the Court "may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255). Put differently, the Court's sole task in deciding a motion for summary judgment is simply "to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

## III. DISCUSSION

Plaintiffs each initially brought claims against each Defendant for First Amendment retaliation under 42 U.S.C. § 1983, violations of the New Jersey Civil Rights Act, N.J.S.A. 10:6-2 (the "NJCRA"), and conspiracy to violate civil rights in violation of 42 U.S.C. §

1985. In their oppositions to Defendants' Motions, however, both Plaintiffs have consented to the dismissal of their § 1985 conspiracy claims against all Defendants. In addition, Duardo has consented to the dismissal of his § 1983 claim for First Amendment retaliation as against the City. Thus, the only claims left for the Court to analyze are: (1) both Plaintiffs' § 1983 claims for First Amendment retaliation against the Individual Defendants alleged in Count II; (2) Sybel's § 1983 claim for First Amendment retaliation against the City alleged in Count I; and (3) both Plaintiffs' NJCRA claims against all Defendants alleged in Count III. The Court will address these claims in turn.

## A.   Count II – First Amendment Retaliation Against the Individual Defendants

In Count II, Plaintiffs assert claims for retaliation in violation of their First Amendment rights under § 1983 against each of the Individual Defendants.[6] To succeed on a First Amendment retaliation claim under § 1983,[7] Plaintiffs, as public employees, must show: (1) that their activities were protected by the First Amendment, and (2) that their activities were substantial or motivating factors in the Individual Defendants' alleged retaliatory actions against them. *Falco v. Zimmer*, 767 F. App'x 288, 299 (3d Cir. 2019). If Plaintiffs satisfy their burdens as to both elements, the burden shifts to Defendants to prove that (3) the same action would have been taken even if the protected activities had not occurred." *Id.* Because the Individual Defendants concede that the filing of both the 2009 Lawsuits and the Current Lawsuit constitute activities protected by the First Amendment, the Court focuses its analysis only on the second and third factors.

To demonstrate that protected activity was a substantial or motivating factor in the alleged retaliation, Plaintiffs must show: (1) that the person accused of retaliation was aware of the constitutionally protected activity, (2) that the retaliatory action was not *de minimis*, but sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and (3) that there is a causal link between the protected [activity] and the retaliatory acts. *Id.* at 311. Though the threshold for what actions may be considered retaliatory is low, such actions must generally be more than mere "criticism, false accusations, or verbal reprimands." *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003). Moreover, Plaintiffs' may establish the requisite causal link between their protected activities and Defendants' alleged retaliation in one of three ways: (a) by establishing an unusually suggestive temporal proximity between the protected activity and allegedly retaliatory action, (b) by establishing a pattern of antagonism coupled with timing, or, in

---

[6] Although presented as a single count in the Amended Complaint, Count II broadly asserts a claim for retaliation by both Plaintiffs against each of the Individual Defendants relating to both the 2009 Lawsuits and the Current Lawsuit that encompasses multiple alleged acts of retaliation with respect to each Plaintiff and each Lawsuit.

[7] To state a claim under § 1983, Plaintiffs must show: (1) the violation of a federal right; (2) by a person acting under color of state law. *Walker v. City of Newark*, Civ. No. 19-16853 (KM) (ESK), 2020 WL 3542502, at *6 (D.N.J. July 1, 2020).

the absence of either scenario, (c) by pointing to evidence that may be gleaned from the record as a whole from which the trier of fact may infer causation. *See Otero v. Port Authority of N.Y. & N.J.*, 2021 WL 3879092, at \*13-14 (D.N.J. Aug. 30, 2021).

The Court will analyze the various retaliation claims against the Individual Defendants by protected activity and by Plaintiff, beginning with the alleged retaliation suffered by Duardo and Sybel in connection with the 2009 Lawsuits.

### 1. Retaliation for the 2009 Lawsuits

As noted, both Plaintiffs claim that they were subject to retaliation for their participation in the 2009 Lawsuits. The Court will address the claimed instances of retaliation by each Plaintiff in turn.

### i. Duardo

Duardo identifies six separate acts of alleged retaliation by the Individual Defendants for his participation in the 2009 Lawsuits. Duardo's claims, however, fail for several reasons.

### a. No Evidence of Personal Involvement

 First, Duardo fails to allege the personal involvement of any named Individual Defendants for certain alleged acts of retaliation. Generally speaking, a defendant is only liable under § 1983 where a plaintiff demonstrates their personal involvement in the deprivation of a federal right. *Vazquez v. City of Hackensack*, 2022 WL 2358399, at \*7 (D.N.J. June 30, 2022). Supervisors, however, may be treated as "personally involved" in wrongdoing by their subordinates, and thus liable therefor, if there is evidence that the supervisor either: (1) "with deliberate indifference to the consequences, established and maintained a policy, practice, or custom which directly caused [the] constitutional harm"; or (2) "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinate's violations." *Id.* (quoting *A.M. ex. rel. J.M.K. v. Luzerne Cnty. Juvenile Detention Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)).

Here, although Duardo appears to assert a retaliation claim with respect to the 2009 Lawsuits against Troast, there is no evidence in the record that Troast, who was not even appointed as city manager until *after* the 2009 Lawsuits settled, was directly or indirectly involved in any disciplinary or retaliatory action against Duardo. (*See* Groh Reply Cert., Ex. P). Thus, to the extent Duardo asserts a retaliation claim against Troast in connection with the 2009 Lawsuits, summary judgment is granted and Duardo's claim is dismissed.

Similarly, Duardo has not identified any evidence in the record that any Individual Defendant was personally involved in the decision to deny his request to work the night shift upon his transfer to the patrol division. Though Aquila acknowledged discussing a shift change with Duardo, he also testified that shift decisions in the patrol division were left to the discretion of Corcoran, the patrol captain at the time. Aquila further testified that Corcoran did not need his approval before assigning shifts to officers in the patrol division,

and he did not recall ever instructing Corcoran to deny Duardo's request for the night shift. Although Duardo speculates that Aquila was ultimately responsible for forcing him to remain on the day shift, the only relevant evidence in the record contradicts that claim. *See Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) ("[A]n inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment."). Accordingly, summary judgment is warranted on Duardo's retaliation claim to the extent it is based on the denial of his request to work the night shift in patrol as a result of his participation in the 2009 Lawsuits.

### b. Insufficient Evidence of Adverse Action

Other aspects of Duardo's retaliation claim as it relates to the 2009 Lawsuits warrant dismissal because there is no evidence of sufficiently retaliatory or adverse action. In particular, the Court finds that Duardo's retaliation claims arising out of the installation of security cameras outside of the narcotics division's office must be dismissed. Nothing in the record suggests that Duardo suffered any adverse consequences as a result of the security cameras. Moreover, though Plaintiffs speculate that the cameras were installed to scrutinize or intimidate them, the record is clear that the cameras were installed (1) in an adjacent hallway leading to multiple offices, not solely narcotics, and (2) as part of a broader security upgrade to the HPD's headquarters that included the installation of cameras elsewhere in the building as well as the installation of panic buttons and other security measures. In other words, no reasonable jury could conclude that the installation of security cameras in the hallway outside of the narcotics office was a retaliatory action related in any way to the 2009 Lawsuits.

The same can be said of Duardo's claims arising out of Aquila's disclosure of internal affairs matters to Riotto in the presence of his secretary. Aquila testified that Riotto approached him in his office to discuss Duardo's reassignment to the patrol division, which Aquila explained was due to Duardo's alleged untruthfulness during internal affairs investigations, including the then-pending matter regarding his hairstyle. When Duardo wrote a memo to Aquila noting this improper conversation, Aquila referred the matter to internal affairs to investigate, and Duardo declined to file a complaint against either Aquila or Riotto. The only actionable adverse consequences Duardo may have suffered as a result of this conversation, if any, are trivial and "more akin to petty slights, minor annoyances, and simple lack of good manners which are not actionable in an analogous legal context . . . than retaliation that would deter an ordinary person from speaking out." *Falco*, 767 F. App'x at 311 (quotations omitted); *Cf. McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) ("[N]ot every critical comment – or series of comments – made by an employer to an employee provides a basis for a colorable allegation that the employee has been deprived of his or her constitutional rights.").

As such, summary judgment is granted on Duardo's retaliation claim with respect to the 2009 Lawsuits to the extent it is premised on the installation of security cameras or the disclosure of Duardo's pending internal affairs matters.

c. **No Causal Link Between 2009 Lawsuits and Alleged Retaliation**

With respect to the other alleged retaliatory acts by the remaining Individual Defendants, assuming that the various internal affairs investigations and division reassignments were sufficiently adverse, *see Ferraioli v. City of Hackensack Police Dep't*, Civ. No. 09-2663 (SRC), 2010 WL 421098, at *6 (D.N.J. Feb. 2, 2010), Duardo has failed to produce any evidence of a causal link between these actions and the 2009 Lawsuits. First, the timing of the alleged retaliatory acts is not "unusually suggestive" of a retaliatory motive. Each of the allegedly retaliatory actions identified by Duardo occurred 7 years after the 2009 Lawsuits were filed. "Although there is no bright-line rule for the time that may pass between protected speech and what constitutes actionable retaliation," *Dondero v. Lower Milford Twp.*, 5 F.4th 355, 361-62 (3d Cir. 2021) (quotations omitted), the temporal proximity that allows for an inference of unusual suggestiveness "is on the order of days or weeks" rather than the years between events at issue here, *Rink v. Northeastern Educational Intermediate Unit 19*, 717 F. App'x 126, 134 (3d Cir. 2017).

Nor can Duardo point to a "pattern of antagonism coupled with timing" to establish the requisite causal link. The record is devoid of any evidence that would suggest any animus, hostility, or antagonism between Duardo and any of the Individual Defendants in the intervening period from the commencement of the 2009 Lawsuits until the first allegedly retaliatory actions Duardo identifies in 2016. *See Otero*, 2021 WL 3879092, at *14.

To save his claims, Duardo appears to argue that the evidence gleaned from the record as a whole is sufficient to establish a causal link. Namely, Duardo argues that the Individual Defendants did not have the opportunity to retaliate against him until May 2016 after both Aquila was appointed OIC and Mordaga resigned as Police Director. Once that opportunity presented itself, Duardo argues, it took less than two months until the retaliation began, starting with the investigation and discipline relating to his hairstyle. The Court disagrees for two primary reasons.

First, Duardo remains unable to point to any basis for, or examples of, a retaliatory motive other than the Defendants' alleged allegiance to former chief Zisa back in 2009. Duardo did not have any claims against any of the Individual Defendants in the 2009 Lawsuits, and, as noted, there is no evidence in the record of any ongoing harassment or antagonism in the intervening 7-year period leading up to the first alleged instances of retaliation.

Second, the record establishes an important intervening through-line connecting the alleged instances of retaliation that significantly weakens the causal link between them and the 2009 Lawsuits: Duardo's own admitted misconduct. *See Ruiz v. Morris Cnty. Sherriff's Dep't*, Civ. No. 05-1825, 2008 WL 2229851, at *8 (D.N.J. May 28, 2008) ("[E]vidence of intervening events tend to undermine any inference of retaliatory motive and weaken the causal link."). With respect to the investigation into his hairstyle, Duardo asks the Court to infer causation based on its temporal proximity to Aquila's appointment as OIC. Duardo

16

testified, however, that he did not begin wearing his hair in a bun until after Aquila had become OIC and Mordaga retired. Moreover, it is undisputed that he was ordered by his superiors, including Aquila, to stop wearing his hair in a bun at least twice before facing any investigation or disciplinary action. Indeed, Aquila testified that he would not have been disciplined at all if he obeyed the order to change his hairstyle. Further, the internal affairs investigation concluded that not only did Duardo disobey multiple orders from his superiors, he apparently provided untruthful responses regarding whether he continued to wear his hair in a bun while on duty. In turn, the only evidence in the record suggests that it was Duardo's apparent untruthfulness in this investigation that directly led to Aquila's decision to transfer him to the patrol division.[8] Though Duardo argues that he was singled out for violating HPD regulations on appearance, he pointed only to female officers wearing ponytails rather than any similarly situated male officers who violated the HPD's prohibition on "unusual, outrageous, or faddish haircuts" applicable to males.

The evidence concerning the investigation in connection with Duardo's use of the phrase "what's up, rats?" likewise reveals no plausible connection to the 2009 Lawsuits. Though Duardo and Lloyd's testimony differed with respect to the nature of their confrontation after Duardo made this statement, the basic story is undisputed: Duardo yelled out in the hallway "what's up, rats?" on his way into the narcotics office, which Lloyd, who was standing in the hallway at the time, mistakenly believed was directed towards him and to which he took offense. Aquila testified that he wanted the matter looked into because he did not want captains being referred to as "rats." The subsequent investigation found that Duardo did not refer to Lloyd as a "rat," but that he did use the term, which itself was offensive and a violation of the HPD's rules and regulations. Thus, as with the hairstyle investigation, Duardo's own admitted conduct directly explains the resulting investigation and reprimand.

In short, the record as a whole does not reveal a causal link between the 2009 Lawsuits and any adverse actions against Duardo, but rather multiple instances of misconduct by Duardo followed closely by corresponding investigations and punishment. *See Serodio v. Rutgers*, 27 F. Supp. 3d 546, 553 (D.N.J. 2014); *see also Revell v. City of Jersey City*, 394 F. App'x 903, 907 (3d Cir. 2010). Nothing in the record connects any of these actions to the 2009 Lawsuits other than the fact that Duardo himself was involved and speculates as such. Absent any temporal proximity, evidence of antagonism, or some other non-speculative basis to infer a causal link, that is not enough. In light of the evidence in the record, the Court concludes that no reasonable factfinder could conclude that the 2009 Lawsuits were substantial or motivating factors for any alleged retaliation.

---

[8] On this point, the Court notes that even if Aquila's discussion of Duardo's pending internal affairs matters with Riotto was a sufficiently adverse action, there is still no evidence in the record linking this conversation to the 2009 Lawsuits. Rather, it is clear that, though perhaps improper, the discussion is directly related to the chain of events set in motion by Duardo's decision to wear his hair in a bun and ignore orders to change his hairstyle, and the conclusion by internal affairs that he was untruthful during the investigation with respect thereto.

Accordingly, Duardo's claims for retaliation in violation of the First Amendment with respect to his participation in the 2009 Lawsuits against each of the Individual Defendants are dismissed.

### ii.      Sybel

Like Duardo, Sybel alleges he was retaliated against in several ways for his participation in the 2009 Lawsuits by the Individual Defendants. As with Duardo's claims, however, Sybel's claims fail for several reasons.

### a.      Retaliatory Acts and Adverse Employment Actions Not Alleged in the Amended Complaint

In his opposition to the Defendants' Motion, Sybel raises for the first time two new acts of alleged retaliation and a slightly different description of the adverse consequences he suffered as a result thereof. With respect to the former, Sybel claims that, in addition to the frivolous complaints and investigations he alleged in the Amended Complaint, he was also unfairly targeted by two other anonymous internal affairs complaints in late 2015, neither of which were sustained, claiming that he was improperly involved in a construction project for the HPD and that he improperly tipped off an officer who was the subject of an ongoing internal affairs investigation. With respect to the latter, although the Amended Complaint alleges that Sybel was forced to resign on March 1, 2017 because of the alleged retaliation, he argues in his opposition that he was actually forced to move up his planned retirement date from August 1, 2017 to March 1, 2017. It is well settled, however, that a plaintiff may not amend his complaint by asserting new allegations in an opposition to a motion for summary judgment. *See Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008). This applies equally to new allegations of retaliatory actions, *see Holland v. Macerich*, Civ. No. 09-914 RMB/AMD, 2011 WL 6934969, at *3 (D.N.J. Dec. 29, 2011), as well as new allegations relating to adverse employment actions not fairly encompassed by the allegations already in the Amended Complaint, *see Pankey v. Philadelphia Housing Dev. Corp.*, No. 09-3943, 2011 WL 1161918, at *6 n.2 (E.D. Pa. Mar. 29, 2011). Accordingly, the Court will not consider these new allegations in ruling on Defendants' Motions.

### b.      No Evidence of Personal Involvement

Sybel has similarly failed to produce any evidence of personal involvement in certain alleged retaliatory conduct by the Individual Defendants. First, Sybel made no allegations in the Amended Complaint, and identifies no evidence in the record, that Busciglio or Ehrenburg were personally involved in any of the alleged retaliatory actions with respect to the 2009 Lawsuits. Accordingly, summary judgment is granted as to Sybel's retaliation claim arising out of the 2009 Lawsuits as against Busciglio and Ehrenburg.

Moreover, there is no evidence in the record of any Individual Defendant's personal involvement in, or awareness of, either of the anonymous internal affairs complaints or

subsequent investigations against Sybel in 2016.[9] Although Sybel speculated that Lloyd was responsible for at least one of these anonymous complaints, there is simply no credible, non-speculative evidence in the record to support that claim, which Lloyd denied during his own deposition. (*See* Hastings Cert. – Sybel, Ex. M at 45:17-20). As such, summary judgment is granted with respect to Sybel's retaliation claim arising out of the 2009 Lawsuits to the extent it is based on the instigation of the two anonymous complaints filed against him in 2016.

### c.      No Evidence of a Causal Link Between 2009 Lawsuits and Alleged Retaliation

So narrowed, Sybel's retaliation claim with respect to the 2009 Lawsuits is limited to (1) the internal affairs investigation of Sybel on August 23, 2016 concerning missing money from evidence storage; (2) Aquilla and Troast's denial of Sybel's requests for additional manpower in the narcotics division; and (3) Aquilla's reassignment of Riotto to the narcotics division to serve as commanding officer over Sybel. Assuming, however, that each of these actions is sufficiently adverse to overcome the low deterrence threshold necessary to prove a First Amendment retaliation claim, Sybel's claims nonetheless fail because he is unable to establish a causal link between such actions and the 2009 Lawsuits.

As with Duardo, Sybel's claims all arise 7 years after the commencement of the 2009 Lawsuits. Thus, there is no temporal proximity between Sybel's protected conduct and any alleged retaliation that supports an inference of causation. Similarly, Sybel cannot point to any evidence of a pattern of antagonism or harassment during the intervening period coupled with timing that would support such an inference. Indeed, the opposite appears to be true. For example, in February 2016, he received a positive performance review from Lloyd, who wrote that Sybel was "very personable and ha[d] a very well rounded relationship with his Supervisors, Peers, and Subordinates." (Groh Cert. – Sybel, Ex. H).

Nor can causation be gleaned from the record as a whole. Beyond the significant gap in time between the 2009 Lawsuits and any alleged retaliatory conduct, and the lack of any evidence of any intervening harassment or antagonism, there is simply no credible evidence in the record connecting any of the alleged retaliation to Sybel's participation in the 2009 Lawsuits. As it relates to Lloyd and the initiation of the August 23, 2016 internal affairs investigation, "the presence of an intervening positive employment action . . . substantially weaken[s] the plausibility of the causal link." *Carmichael v. Thomson*, 2018 WL 4629516, at *18 (D.N.J. Sept. 27, 2018). Moreover, as Lloyd testified, there was a straightforward non-retaliatory reason why he initiated an internal affairs investigation: as commanding officer of the BCI division, he was informed that money was missing from the evidence stored in connection with an older case on which Sybel had been involved.

---

[9] There is similarly no evidence from which a reasonable factfinder could conclude that any of the Individual Defendants were personally involved in the anonymous complaints Sybel first raised in his opposition to Defendants' Motions.

Indeed, Lloyd testified that, upon this discovery, he forwarded the information to internal affairs but "never at any point implicated, indicated, or inferred anyone having taken money." (Hastings Cert. – Sybel, Ex. M at 47:16-20). Aside from Sybel's own conjecture about the nature of that investigation and complaints about how it was ultimately handled by internal affairs, nothing in the record connects this investigation to the 2009 Lawsuits in any way.

There is a similar dearth of evidence supporting causation with respect to Sybel's retaliation claim against Aquilla and Troast for a lack of manpower in the narcotics division. The only evidence in the record that Sybel points towards in support of his claims is his own testimony. Sybel's testimony, however, that other divisions in the HPD had more officers than narcotics, even though narcotics was, in his view, among the most important divisions, is, at best, a policy disagreement as to how the HPD was managed. It is not evidence of an intentional effort to retaliate against him for the 2009 Lawsuits. Indeed, there is substantial evidence that significantly undercuts Sybel's claim. For example, in response to a letter from Sybel requesting additional manpower for the narcotics division, Aquilla wrote that two officers had already been recently transferred to the division following the disbandment of the "quality of life task force," and that "manpower was at a minimum." This is consistent with Aquilla's response to Riotto's own request for additional manpower in narcotics upon his reassignment as commanding officer of the division that "all divisions needed more manpower." There is no evidence of any attempt to drain the narcotics division of resources during Sybel's tenure or any increase in the division's resources following his "demotion" from which a reasonable jury could find a retaliatory motive or causal link to the 2009 Lawsuits. In fact, other than Duardo, the only officer who was reassigned by Aquilla out of the narcotics division was apparently reassigned at Sybel's own request. (Groh Cert. – Sybel, Ex. K).

Finally, there is no evidence of any link between Sybel's "demotion" in the narcotics division and the 2009 Lawsuits. Importantly, despite no longer being the "commanding officer" of the division, Sybel himself suffered no change in rank, compensation, or schedule; rather, Riotto, a higher-ranking officer who was himself a plaintiff in the 2009 Lawsuits, was simply transferred into the division. Moreover, there is a significant intervening event that breaks whatever causal chain may have existed between the 2009 Lawsuit and Riotto's transfer into narcotics: Sybel's planned retirement. Riotto was transferred to the narcotics division on July 28, 2016, the day after Sybel wrote a memo to Aquilla stating his intention to retire at some undisclosed point in 2017. (Groh Cert. – Sybel, Exs. O & P). As such, no reasonable factfinder could conclude that Riotto's reassignment as commanding officer of narcotics was retaliation for Sybel's participation in the 2009 Lawsuits.

Accordingly, summary judgment is granted on Sybel's claims for retaliation as they relate to the 2009 Lawsuits.

### 2. Retaliation for the Current Lawsuit

Both Plaintiffs similarly claim that they were retaliated against for their participation in the Current Lawsuit. As with the claims of retaliation arising out of the 2009 Lawsuits, the Court will analyze each Plaintiff's claims in turn.

### i. Duardo

As with his retaliation claims with respect to the 2009 Lawsuits, summary judgment is warranted on Duardo's claims arising out of the Current Lawsuit.

First, as the Court has already noted, it will not consider new allegations of claimed retaliation raised for the first time in opposition to Defendants' Motions. *See Bell*, 275 F. App'x at 160. The only alleged retaliation arising out of the Current Lawsuit that is fairly encompassed by the allegations in the Amended Complaint is the issuance of the May 9, 2017 PNDA suspending Duardo without pay and seeking his termination in connection with the 64 Prospect Investigation. There are no allegations in the Amended Complaint regarding the propriety of the 64 Prospect Investigation or the Brady Investigation, no claims of defamation or retaliation related to the Individual Defendant's public statements, and no allegations concerning the motives behind the City's litigation strategy. Although much of the conduct Duardo complains of has taken place since the filing of the Amended Complaint, there have been no efforts to further amend so as to add these new claims of retaliation. As such, summary judgment is granted with respect to Duardo's retaliation claims against the Individual Defendants to the extent they are based on the separate Brady Investigation, any alleged defamatory public remarks, the alleged mishandling of the 64 Prospect Investigation, or the prosecution of appeals in the corresponding state court litigation.

Second, even if the Individual Defendants had prior knowledge of the Current Lawsuit, there is no credible evidence in the record of any causal link connecting the May 9, 2017 PNDA thereto. At the outset, notwithstanding the temporal proximity between the issuance of the May 9, 2017 PNDA and the commencement of the Current Lawsuit, the timing of the surrounding events does not support an inference of causation. In particular, there is no dispute that (1) the incident at 64 Prospect occurred months before the filing of the Current Lawsuit, (2) that the anonymous letter triggering the investigation was received by Busciglio in internal affairs a week before the filing of the Current Lawsuit, (3) that the 64 Prospect Investigation had begun in earnest before the City was served with the Summons and Complaint in the Current Lawsuit, and (4) that Busciglio himself, who ran the 64 Prospect Investigation, was not even a named defendant in the Current Lawsuit until after the May 9, 2017 PNDA was issued. In other words, it is clear that there was an ongoing investigation led by parties who were not originally named as defendants in the Current Lawsuit into activity that occurred months before the Current Lawsuit was filed. That this investigation led to discipline after the Current Lawsuit was filed does not automatically render such discipline retaliatory. To hold otherwise would effectively allow Duardo to insulate himself from otherwise appropriate adverse employment actions. *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267-28 (3d Cir. 2007).

Indeed, the impropriety of Duardo's actions, and those of the other officers involved, during the warrantless entry and search of Apartment C7 at 64 Prospect Avenue has already been determined by several hearing officers, administrative tribunals, and New Jersey state courts. Each of these administrative and judicial bodies has found that Duardo, and others, engaged in serious misconduct warranting substantial discipline. Although Duardo continues to dispute these findings, this case is not a forum to relitigate his disciplinary proceedings. In that regard, Duardo fails to produce any evidence that connects the nature and scope of his discipline to the filing of either the Current or 2009 Lawsuits. Each of the officers targeted by the 64 Prospect Investigation (except for Sybel, who had already retired), including those who were not parties to either the Current or 2009 Lawsuits, was issued a PNDA suspending them without pay and subject to termination outside the bounds of standard "progressive discipline" for their misconduct. While the City's decision to suspend the officers without pay and to terminate them was reversed with respect to some of the officers, including Duardo, the record is clear that the City's approach to discipline was consistent regardless of past or present litigation.

In the absence of any evidence that he was unfairly targeted or disproportionately punished due to the Current and 2009 Lawsuits, Duardo relies entirely on speculation, conjecture, and implausible characterizations of almost all of the Individual Defendants' actions from the initiation of the 64 Prospect Investigation to the City's litigation strategy in the subsequent disciplinary proceedings to identify a retaliatory animus or causal connection between his protected activities and the issuance of the May 9, 2017 PNDA. For example, Duardo argues, without any evidence, that Busciglio authored the anonymous 64 Prospect Letter and intentionally ignored or withheld exculpatory evidence in the 64 Prospect Investigation in order to retaliate against him. He also suggests that Ehrenburg's decision to seek his termination and his public comments must be further evidence of a retaliatory animus against him. Indeed, he even argues that the City's appeals of decisions ordering his reinstatement and certain back pay and benefits must be motivated by some sort of retaliatory animus in connection with the Current and 2009 Lawsuits. But this "myopic view," in which every action by the Defendants following the commencement of the Current Lawsuit is necessarily tinged by a retaliatory motive, finds support only in Duardo's unsubstantiated allegations – not the record. *See Brennan*, 350 F.3d at 424. There is simply no evidence in the record of this case from which a reasonable jury could conclude that the issuance of the May 9, 2017 PNDA was at all motivated by either the Current or 2009 Lawsuits.

Accordingly, summary judgment is granted with respect to Duardo's claim for retaliation in violation of the First Amendment in Count II of the Amended Complaint.

### ii.     Sybel

Sybel's claims for retaliation arising out of the Current Lawsuit are equally unavailing. At the outset, the Court notes that by the time the Current Lawsuit was filed and any alleged retaliatory action as a result thereof took place, Sybel had retired from the HPD. He thus brings this component of his retaliation claim as a private citizen rather than

a public employee. To successfully do so, he must establish: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Independence. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006). Though formulated slightly differently than the elements of a retaliation claim brought by a public employee, "both iterations of the elements boil down to similar core considerations." *Falco*, 767 F. App'x at 299.

In the Amended Complaint, Sybel alleges that Busciglio and the City retaliated against him for the Current Lawsuit by sending letters to his home informing him of the pending criminal investigation of the incident at 64 Prospect. The Court also notes, once again, that Sybel raises new allegations of retaliation for the first time in his opposition to Defendants' Motions – namely, that Busciglio retaliated against him for the Current Lawsuit by twice sending officers to his home to deliver certain internal affairs documents related to the 64 Prospect Investigation. As with the other retaliation claims asserted for the first time in opposition to the Defendants' Motions, the Court will not consider these new retaliation claims.

In essence, Sybel's claim appears to be that, because he was retired, he was not subject to an administrative investigation by internal affairs, and Busciglio was not authorized to conduct a criminal investigation under the applicable Attorney General Guidelines. Because Busciglio nonetheless sent him a letter saying that the internal affairs division of the HPD was conducting a criminal investigation into the incident at 64 Prospect and requesting an interview, which was followed by similar letters from the City's own labor attorney, Sybel argues he was being harassed and retaliated against for filing the Current Lawsuit. The Court disagrees.

Assuming that the delivery of letters informing Sybel of an ongoing criminal investigation into an incident in which he was involved prior to his retirement and asking for him to come in for an interview is sufficient to deter someone of ordinary firmness from exercising their First Amendment rights, Sybel has again failed to identify a causal link between the delivery of these letters and either the Current or 2009 Lawsuits. As the Court noted in granting summary judgment with respect to Duardo's retaliation claims, there is no genuine dispute that the officers engaged in significant misconduct at 64 Prospect when they entered and searched Apartment C7 without a warrant. Every officer who took part in that warrantless search was the subject of both a criminal and an administrative investigation, regardless of whether they had participated in either the Current or 2009 Lawsuits against the City. The only exception was Sybel, who, due to his retirement, was no longer subject to disciplinary actions resulting from administrative investigations. Because the Court has already concluded that the initiation of the 64 Prospect Investigation was not retaliatory, it stands to reason that neither was a reasonable attempt to conduct that investigation by informing a target officer and arranging an interview.

In other words, Sybel fails to point to any evidence in the record that would support an inference that the letters he received with respect to the 64 Prospect Investigation were

in any way related to filing of either the Current or 2009 Lawsuits rather than the legitimate ongoing investigation of officer misconduct. As such, summary judgment is granted on Sybel's claims for retaliation against the Individual Defendants in Count II of the Amended Complaint.

### B.     Count I – First Amendment Retaliation Against the City

In addition to his claims against the Individual Defendants, Sybel argues that the City itself is liable for the retaliatory actions of Lloyd and Aquilla while they were OIC of the HPD. For a municipality to be liable for constitutional violations under § 1983, a plaintiff must establish that their injuries were caused by an official policy or custom of the municipality. *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978). Because a municipality may be not liable under a *respondeat superior* theory of liability, a municipality is, generally speaking, liable for the actions of its employees in only three circumstances: (1) if the employee acts "pursuant to a formal government policy or a standard operating procedure long accepted within the government entity"; (2) "when the individual has policy making authority rendering his or her behavior an act of official government policy"; or (3) if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes." *McGreevy v. Stroup*, 413 F.3d 359, 267 (3d Cir. 2005) (citations omitted).

Here, Sybel argues that Lloyd and Aquilla were policymakers with final decision-making authority with respect to the various alleged acts of retaliation. However, the Court has already determined that Sybel did not suffer any constitutional injury caused by the Individual Defendants, including Lloyd and Aquilla. As such, he cannot establish any constitutional violation by them as policymakers for purposes of his claim against the City. *See Vazquez*, 2022 WL 2358399, at *8; *see also Stanford v. Stiles*, 456 F.3d 298, 314 (3d Cir. 2006) ("[I]n order for municipal liability to exist, there must still be a violation of the plaintiff's constitutional rights."). Accordingly, summary judgment is granted on Sybel's First Amendment retaliation claims against the City as alleged in Count I of the Amended Complaint.

### C.  Count III – Violations of the NJCRA

Finally, both Plaintiffs assert claims under the NJCRA for the violation of rights secured by the New Jersey Constitution. The NJCRA, however, was modeled after, and has been interpreted analogously to, § 1983. *See Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011). To that end, courts have analyzed claims for retaliation in violation of the New Jersey Constitution under the NJCRA in the same manner as claims brought for violations of the First Amendment under § 1983. *See, e.g.*, *Southward v. Elizabeth Board of Educ.*, Civ. No. 15-3699 (KM), 2017 WL 111924, at *11 & n.8 (D.N.J. Jan. 11, 2017). Thus, because the Court has found that there is not genuine dispute of material fact with respect to Plaintiff's First Amendment retaliation claims against any of the Defendants under § 1983, summary judgment is similarly warranted with respect to their claims under the NJCRA.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motions are **GRANTED** in their entirety. An appropriate order follows.


                                      /s/ William J. Martini

**Date: October 18, 2022**                    **WILLIAM J. MARTINI, U.S.D.J.**